**RUSSELL TRANSFER,
INCORPORATED,
Petitioner,**

v.

**UNITED STATES of America and
Interstate Commerce Commission,
Respondents.**

No. 75–1949.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 6, 1976.

Decided Sept. 16, 1976.

---

James T. Proctor, Atty., I. C. C., Washington, D. C. (Fritz R. Kahn, Gen. Counsel, I. C. C., Thomas E. Kauper, Asst. Atty. Gen., Carl D. Lawson, Atty., U. S. Dept. of Justice, on brief), for respondents.

Liniel G. Gregory, Jr., Salem, Va., for petitioner.

Before HAYNSWORTH, Chief Judge, and BUTZNER and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

This appeal seeks to set aside an order by the Interstate Commerce Commission denying a gateway elimination application filed by the petitioner, Russell Transfer, Inc. (Russell). While the order of the commission is affirmed, we remand this matter to the ICC, for the limited purpose of determining what, if any, effect that denial will have upon certain specific authorization contained in Russell's operating authority allowing tacking operations.

The petitioner, Russell, is a common carrier authorized by the ICC to engage in interstate cartage. As such, it could, following Commission approval, operate over either regular or irregular routes, or both. Regular route authority permits operation "between fixed termini and over a regular route or routes . . . ." *Classification of Property*, 2 MCC 703, 709 (1937). Irregular route authority, on the other hand, permits service from a fixed point or points to points or communities within a radial area or some general territory designated by the Commission. *Id.* The significance of the type of route authorization is substantial

when viewed in terms of operations. A regular route carrier operates between fixed points according to a predetermined plan involving the habitual use of certain fixed routes. *Brady Transfer & Storage Co. v. United States*, 80 F.Supp. 110 (S.D. Iowa 1948), aff'd., 335 U.S. 875, 69 S.Ct. 239, 93 L.Ed. 418 (1948). Irregular route operations, by way of contrast, are conducted over any route located between a carrier's authorized service areas. In Russell's case, it holds certain separate and distinct irregular route authorities allowing the transportation of particular commodities (e. g., sugar from Baltimore, Maryland to Christiansburg, Radford, Pulaski, Blacksburg and Roanoke, Virginia). It also holds irregular route authority permitting the cartage of general commodities between specified points.[1]

In the past where a common carrier, whether operating over regular or irregular routes, held separate and unrestricted grants of authority which had a common point of service to and from which a shipment could be made, the Commission permitted the carrier to furnish service on the shipment under a combination of those authorities. See, e. g., *De Rosa Transportation, Inc., Extension—Chicago, Ill.*, 95 MCC 494 (1964). Thus, in Russell's case, where it had separate and unrestricted grants of authority to operate between South Carolina and Roanoke, Virginia, and Baltimore, Maryland in another, it was permitted to combine these authorities and perform services from South Carolina to Baltimore through the Roanoke "gateway." The Commission points out that the majority of

these tacking operations were never specifically authorized under any certificate. Instead, the ICC merely acquiesced in the carriers' practice of combining authorities. It is significant, however, that in Russell's Certificate of Convenience and Necessity, it explicitly states that Russell may "perform through service under a combination of the authorities described . . .."

As motor carriers obtained successive grants of authority over the years, it became apparent to the Commission that the tacking of separate grants of authority often led to circuitous transportation routes. Thus, in order to provide more direct routing, the Commission established certain criteria for the voluntary elimination of gateways. Under these criteria, an irregular route carrier such as Russell could avoid the necessity of observing its gateways by making one of two showings. Under the first alternative, a carrier might avoid its gateways by establishing that their elimination would result in more economical operations. This had to be coupled with a demonstration that the carrier was actually transporting a substantial volume of its certificated traffic to and from the points involved by operating in good faith through the gateway and, in so operating, was effectively and efficiently competing with existing carriers. Additionally, the carrier was required to show that elimination of the gateway would not enable it to institute a new service or a service so different from that presently provided as to materially improve its competitive position. *Childress—Elimination Stanford Gateway*, 61 MCC 421 (1952).[2] Under the second alternative, a

---

1. Russell's Certificate of Convenience and Necessity, permits it to transport general commodities from Roanoke, Virginia to Lynchburg, Norfolk, Richmond, Danville, Bristol, Narrows, and Grundy, Virginia; Winston-Salem, Greensboro, Durham, Canto, Asheville, Charlotte, and Raleigh, North Carolina; Washington D. C.; Baltimore, Maryland; Wilmington, Delaware; Philadelphia, Pittsburgh, Marcus Hook, York, and Harrisburg, Pennsylvania; Newark and Swedesboro, New Jersey; and Charleston, Bluefield and Huntington, West Virginia. In addition, it permits cartage from points in South Carolina to Roanoke, Virginia.

2. As amplified in cases subsequent to *Childress*, an irregular route carrier voluntarily seeking the elimination of its gateways was required to demonstrate that it had been an efficient competitor as to substantially all of its certified commodities between substantially all of the authorized origin and destination points involved in its outstanding certificates. See, *Service Trucking Co., Inc., Extension—Frozen Pies and Pastries*, 88 MCC 697, 701 (1962); *Frank Cosgrove Transp. Co., Inc., Extension—Liquid Commodities*, 83 MCC 691, 695 (1960); *Ace Lines, Inc., Extension—Elimination of Gateway*, 79 MCC 685, 689 (1955). Although the applicant was not required under the *Chil-*

carrier could eliminate gateways by the traditional showing that there was a need for the proposed service which was not being met by existing carriers.

On November 23, 1973, the Commission, faced with a national energy crisis and mindful of circuitous tacking operations being conducted, instituted rule-making proceedings designed to streamline gateway elimination procedures. Gateway elimination regulations were subsequently adopted which abolished the prior case-by-case practice of processing and deciding voluntary applications for direct authority to serve origins and destinations previously served by tacking authorities at gateway points. 49 CFR Part 1065. Specifically, the regulations provide, in pertinent part:

"No carrier holding irregular route authority can tack two or more grants of authority except as otherwise provided under § 1065.1(a) or (b). 49 CFR § 1065.-1(b).

"Where such tacking or gateway movement is 300 miles or less from origin to destination, or where allowed by § 1065.-1(a), or *where such tacking or joinder of authorities is "specifically authorize[d]"*, a common carrier may continue such operation. 49 CFR § 1065.1(b).

"Where a particular carrier's operation over a direct route is at least 80% of the distance between origin and destination using gateways, it may use the direct route and the carrier is required to file a letter notifying the Commission of its desire to conduct direct operations. 49 CFR § 1065.1(a), d(1).

"Where a carrier conducts gateway operations unless expressly allowed under § 1065.1(a), or of 300 miles or less, or specifically authorized, it must cease such

operations unless it files for and receives authorization to eliminate its gateways. Pending final determination of any such application, a carrier may continue to provide such service by observing its gateways. 49 CFR § 1065.1(b)."

The regulations further provide that any such gateway-elimination application filed under these new rules "will be processed in accordance with the normal procedures" of the Commission as outlined in the ICC's report and order in *Gateway Elimination*, 119 MCC 530 (1974). 49 CFR § 1065.-1(d)(2)(iv). That order specifically states that "[i]n deciding such . . . application we [the Commission] will apply the criteria enumerated in the *Childress* case . . . as amplified in other Commission precedent decisions" which we have previously set forth. 119 MCC at 550.

■ On June 4, 1974, Russell filed a gateway elimination application in accordance with 49 CFR Part 1065. That application sought to eliminate the gateways at Roanoke and Lynchburg, Virginia.[3] Support in the form of a verified statement by Russell's Vice President accompanied the application. That statement included a traffic study consisting of computer printouts of unspecified traffic. In opposition to Russell's application, verified statements were filed by seven common carrier protestants.

On June 4, 1975, the Commission, through its Review Board # 2, issued an order which stated, in part:

"[A]pplicant relies on computer printouts of past shipments to support the operations; that these printouts unfortunately omit the most necessary information, which commodities are being transported; that it is impossible, therefore, for us to properly determine if any of the specific

---

dress rules to demonstrate that it had transported each and every commodity for which it held authority, it was required to demonstrate that it had transported "a substantial volume . . . [of] substantially all of the commodities." See, e. g., *Blue Ridge Transfer Co., Inc. Extension—West End N. C.*, 115 MCC 300, 303 n. 1 (1972).

3. Previously, on February 8, 1973, Russell filed an Emergency Temporary Authority Gateway

application which was granted March 6, 1973. It authorized elimination of the Roanoke and Lynchburg gateways in the provision of through service. This authority was limited to a duration of 30 days, however, commencing March 9, 1973. By petition filed with the Commission on April 5, 1973, Russell sought an extension of this temporary authority. No action has yet been taken on that application.

commodities has been moved or if substantial commodities under applicant's general commodity rights have been moved; that based on the evidence presented, an intelligent grant of authority cannot be framed . . .."

Accordingly, the Review Board found Russell had failed to establish that present or future public convenience and necessity required elimination of these gateways.

Russell thereafter filed a petition for reconsideration which was denied by Division I of the Commission acting as an appellate division. It was the opinion of that division, upon consideration of the entire record, that the findings of the Review Board were "in accordance with the evidence and applicable law." Based upon a review of the supporting data, we cannot say that the Commission's decision was "arbitrary, capricious, . . . an abuse of discretion, or otherwise not in accordance with law."[4] It is clear that, throughout these proceedings, Russell had the burden of proof. E. g. *Tri-State Motor Transit Co. v. United States*, 369 F.Supp. 1242, 1244 (W.D.Mo.1973); *Arizona-California Express, Inc. v. United States*, 224 F.Supp. 894, 897 (D.Colo.1953). It is equally clear that Russell did *not* sufficiently identify the commodities being transported, thus rendering it impossible to say from the record that Russell was transporting a substantial volume of its certificated goods through the gateways to and from the points involved. *Childress—Elimination Stanford Gateway*, 61 MCC 421 (1952). The burden of proof was upon Russell and it simply failed to meet the burden. Accordingly, we are of opinion that petitioner's assignments of error as to the Commission's denial of the gateway-elimination application are without merit and the Commission order denying the application should be affirmed.[5]

■ But we are left with the question of what effect, if any, that order has upon Russell's authority under its Certificate of Convenience and Necessity to provide service "under a combination of [its] authorities." Pursuant to the Commission's denial of Russell's request for a stay pending appeal, Russell was required to cease gateway operations by September 19, 1975. Counsel for Russell argues that this constitutes a partial revocation of authority. Counsel for the Commission responds that the ICC did not intend to revoke, alter or amend Russell's authorized tacking operations and that the Commission's order does not apply to those portions of Russell's tacking operations undertaken pursuant to its certificate.

Under the government's interpretation of the ICC order, where authorized by its certificate, Russell may continue its tacking operations. Such operations would, however, have to be performed via the specified gateways. While this appears consistent with 49 CFR § 1065.1(b), which provides for continuation of gateway operation where certificated authorities "authorize such tacking," it nevertheless is apparent that the Commission did not consider Russell's specific tacking authority in issuing its denial and order. Thus, we are of opinion that this matter should be remanded to the ICC to consider what, if any, effect its denial of Russell's gateway elimination application and its subsequent order have on

---

4. Administrative Procedure Act, 5 U.S.C. § 706.

5. Our opinion is not inconsistent with *Frozen Food Express, Inc. v. United States*, 535 F.2d 877 (5th Cir. 1976). That case involved, among other things, a misleading statement by an ICC representative not denied by the ICC, which element is not present here. In our case we also note the ICC considered such additional evidence as was presented with the petition for reconsideration.

A motion was made before us after argument to require, by injunction, the admission of additional evidence. That motion is denied.

We should say that in view of the ICC position that the petition contained insufficient information, the object of gateway elimination being to save gasoline, its oral argument that it would not consider on the merits a petition containing sufficient information absent a request for extraordinary relief may be out of place. We do not reach that question because it is not presently before us. *Cf. Frozen Food Express*, 535 F.2d at p. 879.

the company's authorized tacking operations.

In conclusion, the ICC's action in denying the application is affirmed, but the case is remanded for further consideration of the question set forth just above.

AFFIRMED IN PART AND REMANDED.