**EAGLE MOTOR LINES, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.**

**No. 76-2098.**

United States Court of Appeals,
Fifth Circuit.

Jan. 24, 1977.

Douglas Arant, Birmingham, Ala., Mark J. Andrews, Fritz R. Kahn, Washington, D.C., for petitioner.

Edward H. Levi, U. S. Atty. Gen., U. S. Dept. of Justice, Lloyd John Osborn, Antitrust Div., App. Sec., Dept. of Justice, Washington, D.C., Arthur J. Cerra, Gen. Counsel, ICC, Walter H. Walker, III, Atty., ICC, Washington, D.C., for respondents.

Before RIVES * and MORGAN, Circuit Judges, and VARNER,** District Judge.

LEWIS R. MORGAN, Circuit Judge:

Petitioner Eagle Motor Lines, Inc. (Eagle) seeks review of an order of the Interstate Commerce Commission (ICC) revoking Eagle's authority to operate under the ICC's gateway elimination rules.[1] Eagle challenges the ICC order on the basis that the Commission should have granted Eagle

---

* Judge Rives was a member of the panel that heard oral argument but due to illness did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

** District Judge for the Middle District of Alabama, sitting by designation.

1. 49 C.F.R. § 1065.1.

an opportunity to be heard before revoking the authority.[2] We agree with Eagle.

## I. INTRODUCTION.

The ICC's gateway elimination rules altered a practice called tacking. When a motor carrier possesses a certificate of authority to operate between points $A$ and $B$ and then obtains a new certificate to operate between points $B$ and $C$, the combining of the two authorities to provide "through" service between points $A$ and $C$ is called tacking. Point $B$ is called the gateway.

Before the ICC promulgated its gateway elimination rules, tacking could be accomplished only via the gateway. Of course, the shortest route between $A$ and $C$ might not be through $B$, and gateway tacking therefore wasted a lot of fuel. Prodded by the energy crisis of late 1973 and 1974, the ICC promulgated its gateway elimination rules, which allow carriers to go from $A$ and $C$ without passing through $B$. The rules prohibit gateway tacking except under certain limited circumstances.[3]

## II. FACTS.

The events leading to this dispute began in 1969, when Eagle requested a certificate of operating authority designated Sub-No. 272. In its application for the authority—and in the *Federal Register* notice thereof—Eagle indicated that the Sub-No. 272 could not be tacked with Eagle's existing authority to provide through service. The Sub-No. 272 authority was granted in 1970, but no restriction against tacking appeared on the certificate.[4] In fact, the Sub-No. 272

authority could be tacked with Eagle's existing authority, and Eagle did engage in through service for four years using the Sub-No. 272 certificate.[5]

In 1974, Eagle requested and was granted gateway elimination authority with respect to the Sub-No. 272 certificate and the other certificates to which the Sub-No. 272 had been tacked. In 1976, one of Eagle's competitors sought to challenge Eagle's gateway elimination authority, but the challenge came too late and was denied. The ICC "reopened" the Eagle matter on its own motion, however, and concluded that Eagle "failed to qualify" for gateway elimination. The effect of the order was to prohibit Eagle from tacking, with or without gateways, on movements of over 300 miles.[6]

The basis for the ICC's action was that the Commission's records regarding the Sub-No. 272 authority showed that Eagle had misrepresented, either intentionally or unintentionally, the tacking potential of the sought authority.

The ICC revoked Eagle's gateway elimination authority summarily. Eagle was given no opportunity to be heard.

## III. DISCUSSION.

A. *The ICC's Power to Suspend or Terminate Certificates, Permits, or Licenses.*

In Congress's statutory framework for the regulation of motor carriers, one section, 49 U.S.C. § 312, purports to define the limits of the ICC's power to suspend or terminate certificates, permits, or licenses.

---

**2.** Eagle also contends that the ICC's asserted justifications for revoking Eagle's authority serve only to mask the real motive for the Commission's conduct—a change in ICC policy. We find no basis in the record for this contention, and we reject it.

**3.** The gateway elimination regulations allow gateway tacking on movements of 300 miles or less or where a carrier's certificated authorities specifically authorize such tacking. 49 C.F.R. § 1065.1(b).

**4.** The absence of a tacking restriction was not unusual. The ICC's policy regarding tacking was that "grants of authority are not encum-

bered with restrictions against tacking unless circumstances are present which convincingly and clearly demonstrate that such limitations are required by the public interest." *Curtis, Inc.*, 113 M.C.C. 170, 180 (1971), *aff'd*, No. C–3498 (D.Colo. July 21, 1975).

**5.** Eagle concedes that it tacked openly and notoriously and that it intervened before the Commission on several occasions to oppose applications of competitors for authority that would compete with Eagle's "through" service.

**6.** *See* note 3 *supra.*

Under section 312, only a motor carrier's willful failure to comply with a provision of the motor carrier chapter of the Act, a pronouncement of the ICC, or a condition of the certificate, permit, or license can trigger the Commission's suspension or termination power. And section 312 states that certificates, permits, or licenses "shall remain in effect until suspended or terminated as herein provided."

Although section 312 purports to be the exclusive source of the ICC's suspension or termination authority, the Supreme Court has held that 49 U.S.C. § 17, which mandates that "[t]he Commission shall conduct its proceedings . . . in such manner as will best conduce . . . to the ends of justice," gives the ICC the power to modify certificates to correct "inadvertent ministerial errors." *American Trucking Associations, Inc. v. Frisco Transportation Co.*, 358 U.S. 133, 145, 79 S.Ct. 170, 3 L.Ed.2d 172 (1958). In *Frisco*, the Court allowed the ICC to insert into a rail-affiliated carrier's operating certificate a caveat permitting the Commission to restrict the carrier to operations related to its rail services. The record showed that all parties had intended that the caveat be part of the certificate, but that the Commission staff had omitted it through clerical error.

Since *Frisco*, the ICC has expanded its power outside of section 312 to alter certificates. This expansion has occurred primarily in the so-called failure-of-notice cases. *Greenstein Trucking Co.*, 113 M.C.C. 489 (1971), aff'd, *Greenstein Trucking Co. v. United States*, 343 F.Supp. 194 (N.D.Ga. 1972); *Curtis, Inc.*, 113 M.C.C. 170 (1971), aff'd, No. C–3498 (D.Colo. July 21, 1975); *Clarence M. May*, 106 M.C.C. 118 (1967), aff'd, *May Trucking Co. v. United States*, 290 F.Supp. 38 (D.Idaho 1968); *Carl Subler Trucking, Inc.*, 103 M.C.C. 307 (1966), aff'd, *Carl Subler Trucking, Inc. v. United States*, 313 F.Supp. 971 (S.D.Ohio 1970). In each of these cases, there was a disparity between the authority actually granted in the carri-

er's certificate and the carrier's representations to competing carriers regarding the authority sought, the authority granted being broader than that reflected in the notice to competitors. The competing carriers, taken by surprise, were allowed to intervene in the reopened proceedings to attempt to show that the certificates should be altered to conform to the applicant's representations. The Commission justified its action on two bases—the competing carriers' statutory right to notice [7] and the constitutional guarantee of procedural due process.[8]

The ICC cites one of these failure-of-notice cases, *Curtis, Inc.*, supra, and also the Supreme Court's *Frisco* decision, as demonstrating the Commission's power to alter Eagle's operating authority here. The Commission contends that alteration was justified for three reasons: (1) Eagle misrepresented, either intentionally or unintentionally, the tacking capabilities of the Sub-No. 272 authority; (2) Eagle's application in the *Federal Register*, which stated that the authority sought could not be tacked, was inadequate notice to competing carriers; and (3) Eagle benefited from the Commission's inadvertence in failing to place a no-tacking restriction on the Sub-No. 272 certificate.

Assuming that the ICC's power as exercised in the failure-of-notice cases does exist—and Eagle does not seriously challenge this—the application of that power in the instant case might be justified. Moreover, if it could be shown that the absence from the Sub-No. 272 certificate of a no-tacking restriction resulted from an inadvertent clerical error, then *Frisco* would be a source of ICC authority to alter Eagle's operating rights.

 The defect in the ICC's position is not that it lacks the power to act, but rather that it has acted without giving Eagle the same due process right to be heard

---

**7.** 49 U.S.C. § 305(e).

**8.** *See, e. g., Carl Subler Trucking, Inc.*, 103 M.C.C. 307, 312 (1966), aff'd, *Carl Subler*

*Trucking, Inc. v. United States*, 313 F.Supp. 971 (S.D.Ohio 1970).

that the ICC has so diligently guarded with respect both to competing carriers, and, as the following discussion will demonstrate, to others in situations similar to Eagle's.

### B. *Eagle's Right to be Heard.*

The *Frisco* decision, which first recognized an ICC power outside section 312 to alter certificates, approved an earlier pronouncement that any such power could be exercised only after giving the certificate holder notice and an opportunity to be heard.[9] The ICC's own *Subler* decision, the earliest of the failure-of-notice cases discussed above, stressed that

> a certificate issued as a result of proceedings conducted without proper giving of notice is not void *ab initio* ; it is voidable by order of the Commission following appropriate proceedings *in which the certificate holder has, in turn, been given due notice of the issues involved and the opportunity to be heard.*[10]

And *Curtis, Inc.*, the decision cited so boldly by the Commission as authority for its power to act without a hearing, stands for just the contrary proposition. In *Curtis*, where competing carriers were misled by the certificate holder's unintentional misrepresentations regarding tacking, the ICC made clear its position that the certificate could not be altered to conform to the representations without giving the certificate holder the opportunity to be heard. In fact, the certificate holder's due process right to be heard runs throughout the failure-of-notice cases as a companion piece to the competing carriers' right to intervene in opposition to the authority actually granted.

We need not detail the form Eagle's hearing should take. We note, however, that the *Curtis, Inc.* decision gives the best exposition of the issues that the ICC itself has concluded important to consider at such a hearing: e. g., (1) Would a no-tacking restriction have been warranted as being in the public interest at the time the certificate was issued? (2) Did competing carriers have actual knowledge of the true tacking capabilities and intentions of the applicant, so that these competitors were not deprived of an opportunity to be heard? (3) Did the affected parties act with due diligence in bringing the matter to the attention of the Commission for corrective action? And (4), perhaps most importantly, is there shipper need for the challenged service, such that revocation of the authority would be detrimental to the public interest? *See* 113 M.C.C. at 183–87.

### C. *Applicability of the Hearing Requirement to Revocation of Gateway Elimination Authority.*

The ICC designed a quick and simple procedure for the elimination of gateways. Tens of thousands of gateways were eliminated in a very short time by way of a letter-notice procedure that resulted·in virtually automatic approval. The Commission now argues that the *quid pro quo* for the streamlined procedure should be a relaxation of any hearing requirement prior to revocation of the authority.

The Commission has not shown, however, that a hearing requirement would cause a substantial administrative burden. We are unwilling to shortcut procedural due process on the assumption that large numbers of the certificates upon which gateway elimination requests were based contain irregularities of the sort alleged here.

Akin to the ICC's argument that gateway elimination should be treated as an easy come, easy go proposition is its contention the Eagle really does not suffer that much from revocation of the gateway elimination authority, because the underlying Sub-No. 272 certificate remains inviolate, allowing Eagle to continue to tack. The Commission does not stress that continued tacking would be allowed only on routes of under

---

**9.** 358 U.S. at 144–45, 79 S.Ct. 170, *citing United States v. Watson Brothers Transportation Co.,* 350 U.S. 927, 76 S.Ct. 302, 100 L.Ed. 810 (1956).

**10.** 103 M.C.C. at 313 (emphasis added).

300 miles.[11] Thus, indirectly, a significant alteration of the Sub-No. 272 authority would result from revocation of the gateway elimination permission.

The Commission's remaining arguments need not detain us long. The Commission contends that it has "revoked" nothing in taking away Eagle's gateway elimination authority; it has simply "corrected" authority improperly issued. The most charitable response to this contention is that it does not advance the analysis. Finally, the ICC suggests that Eagle, after being deprived of its gateway elimination authority, would not be without remedy, because it could always bring a new application claiming that the authority should be restored as being in the public interest.[12]

We think this procedure would misallocate the burden of proof. Once a certificate, permit, or license has been issued, the burden should be upon the party attacking the certificate, permit, or license to show that the authority should be altered, suspended, or revoked. In this way, the integrity of the grant of operating authority is strengthened and the goal of· "a stable, efficient, economical, and expeditious national transportation system" is better served. *Cf. Curtis, Inc., supra*, 113 M.C.C. at 177.

We remand this case to the ICC for proceedings not inconsistent with this opinion.

REVERSED and REMANDED.

---

11. *See* note 3 *supra.*

12. *See Clarence M. May*, 106 M.C.C. 118 (1967), *aff'd, May Trucking Co. v. United States*, 290 F.Supp. 38 (D.Idaho 1968).