**SENN TRUCKING COMPANY,**
**Petitioner,**

v.

**INTERSTATE COMMERCE COMMIS-**
**SION and United States of**
**America, Respondents,**

**Pre-Fab Transit Co., Intervenor.**

**No. 76–1967.**

United States Court of Appeals,
Fourth Circuit.

Argued April 4, 1977.

Decided Sept. 1, 1977.

Joseph L. Howard, Jr. (William P. Jackson, Jr., Jackson & Jessup, Washington, D. C., on brief), for petitioner.

R. Craig Lawrence, Washington, D. C. (Donald I. Baker, Asst. Atty. Gen., Peter L.

de la Cruz, Atty., U. S. Dept. of Justice, Mark L. Evans, Gen. Counsel and Peter A. Fitzpatrick, Asst. Gen. Counsel, I.C.C., Washington, D. C., on brief), for respondents.

Chandler L. van Orman, Washington, D. C. (Richard H. Streeter, Washington, D. C., Thomas C. Beach, III, Kenneth H. Ekin, Baltimore, Md., Wheeler & Wheeler, Washington, D. C., and Clapp, Somerville, Black & Honemann, Baltimore, Md., on brief), for intervenor.

Before WINTER, BUTZNER and HALL, Circuit Judges.

WINTER, Circuit Judge:

Senn Trucking Company (Senn) seeks review of orders of the Interstate Commerce Commission (Commission) denying Senn's gateway-elimination application and Senn's subsequent petition for reconsideration. Senn contends that the Commission improperly concluded that Senn had failed to prove a public need for the proposed service and that it was error for the Commission to decline to grant a "G" application for service where Senn had secured the protection stemming from its "E" notices. We conclude that the Commission acted properly and legally. We therefore affirm its orders.

## I.

In *Russell Transfer, Inc. v. United States,* 547 F.2d 231 (4 Cir. 1976), we had occasion to review the history of the Commission's treatment of "tacking" by common carriers holding two or more certificates having a common point of service. We repeat the history here:

■ For years the Commission permitted irregular-route motor common carriers,[1] of which Senn is one, to combine, or "tack," separate and unrestricted (as to tacking) operating authorities at their common points or "gateways," so that they could provide a through service between points authorized in one certificate and those in another. In permitting this practice, the Commission never found a public need for such through service because the respective authorities were obtained in separate proceedings. It merely acquiesced in the practice of tacking. *Motor Common Carriers of Property—Routes and Service,* 88 M.C.C. 415, 423 (1961). In such circumstances a "right to tack" did not constitute a part of the carrier's certificate. *Thompson Van Lines, Inc. v. United States,* 399 F.Supp. 1131, 1135–36 (D.D.C.1975), *aff'd,* 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976).

To rationalize the resulting tacking operations, which involve high degrees of circuity when more direct operations would be in the public interest, the Commission established certain standards for elimination of those gateways. *Childress—Elimination Sanford Gateway,* 61 M.C.C. 421, 428 (1952). If a carrier made an appropriate showing,[2] it was authorized to operate directly without observing the gateway.

■ With the advent of the fuel crisis in 1973, the Commission concluded that its pri-

1. "Irregular-route" carriers are those authorized to operate between designated points without restriction as to the route or highway to be utilized. *See generally Motor Common Carriers Property—Routes and Service,* 88 M.C.C. 415 (1961).

2. . . . (1) whether applicant is actually transporting a substantial volume of traffic from and to the points involved by operating in good faith through the gateway and, in so operating, is effectively and efficiently competing with the existing carriers, and (2) whether the elimination of the gateway requirement would enable applicant to institute a new service or a service so different from that presently provided as to materially improve applicant's competitive position to the detriment of existing carriers. In the former instance, a grant of authority sought is justified solely upon proof that the proposed operations would result in operating economies. . . . In the latter instance, . . . it is incumbent upon applicant to prove public convenience and necessity the same as in any other application for new authority.

or benign attitude toward gateway operations should be modified because of the inefficiencies which resulted from gateway use. *Motor Common Carriers of Property—Routes and Service* (hereafter "*Gateway Elimination*"), 119 M.C.C. 170, 171 (1973), 119 M.C.C. 530, 533 (1974). The gateway-elimination regulations of April, 1974, which resulted required all irregular route carriers to apply for expedited direct authority by either (a) "letter-notice" (or "E" notice) procedure, if the circuity involved was less than twenty percent (the amount of circuity which the Commission judged not to affect the competitive balance of existing carriers) (49 C.F.R. § 1065.-1(d)(1)); or (b) formal or "G" application, if the circuity was greater than twenty percent (49 C.F.R. § 1065.1(d)(2)). Since "G" applications require Commission adjudication before gateways can be eliminated, the Commission chose to follow the criteria articulated in *Childress* in deciding whether a "G" certificate should be granted. *Gateway Elimination*, 119 M.C.C. at 550. Essentially, the carrier must establish, by evidence of prior operations, that it actually performs service through the gateway point, or, by evidence of shipper support, that a public need for the proposed through-service exists.

Letter-notices filed with the Commission were not adjudicated at all, but were simply published in the Federal Register and became effective in fifteen days unless the carrier was otherwise notified by the Commission. Thus, by merely setting forth the appropriate information called for by the applicable gateway-elimination regulation, any carrier could eliminate its gateways and use a direct route where the involved circuity was less than twenty percent. *Gateway Elimination*, 119 M.C.C. at 537, 541, 543–45.

The regulations, as promulgated, have been found to be valid by the United States Supreme Court, *Thompson Van Lines, Inc.*

*v. United States*, 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976), *aff'g per curiam*, 399 F.Supp. 1131 (D.D.C.1975), and were upheld, as applied to transfers and acquisitions of irregular route certificates, in *Common Carrier Conference—Irregular Route v. United States*, 534 F.2d 981 (D.C.Cir.1976), *cert. denied*, 429 U.S. 921, 97 S.Ct. 317, 50 L.Ed.2d 288 (1976).

The gateway regulations allowed the filing of "G" applications with respect to applications for certificates of public convenience and necessity which were pending before the agency on the date the regulations became effective. Senn had pending such an application for its Sub 80 certificate.[3] The Sub 80 application was granted on July 24, 1975.

Within sixty days after the issuance of the Sub 80 certificate, Senn filed the gateway-elimination application now under review. At the time that the gateway-elimination application was filed, Senn had already filed 170 letter-notices seeking to eliminate gateway use in order to commence direct operations between points involving circuities of twenty percent or less. A substantial portion of these notices sought authorization duplicating that involved in the "G" application, and Senn requested the Commission to take official notice of the letter-notices. The Commission denied Senn's "G" application because, *inter alia*, Senn failed to prove a public need for the proposed service or to delineate the extent of duplication between Senn's letter-notice applications and the "G" application. In its petition for reconsideration, Senn admitted that sixty-nine of its "E" notices were "completely duplicated" by the instant application. Senn also represented that it did not seek duplicating operating authorities but sought to eliminate the difficulties of multiple "E" notices; it therefore recognized that the grant of its "G" application would automatically cancel

3. Senn's Sub 80 certificate authorized it to transport supplies used in the manufacture and distribution of roofing and roofing materials, gypsum and gypsum products, composition boards, and urethane and urethane products

(except commodities in bulk), from points in three states and the District of Columbia to the facilities of the Celotex Corporation in Wayne County, North Carolina.

the duplicating "E" notices. Senn was, however, responding to the Commission's reliance on duplication as a reason for denying the "G" application, and Senn made no request that its outstanding "E" notices be exchanged for an identical "G" certificate, nor did it argue that any such exchange would be authorized or required.

By final order served August 16, 1976, the Commission denied Senn's petition for reconsideration, and Senn's petition for review followed on or about August 31, 1976.

## II.

■ Senn's first attack on the validity of the Commission's order is that its application for a "G" certificate should have been granted to the extent that it duplicated its "E" notices. Its theory is since it is permitted to perform the services described in its "E" notices, it should be given the greater protection of a "G" certificate. Senn, in its petition for reconsideration, did not advance the argument in precisely the same form which it presses before us. As a consequence, the Commission urges on us the authorities which hold that, before a court may review a decision of the Commission, the Commission must have erred against a proper objection, and thus the failure to raise an issue or press an argument at the administrative level before the Commission forecloses a party seeking review from asserting it before us. *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36–37, 73 S.Ct. 67, 97 L.Ed. 54 (1952); *see also United States v. Capital Transit Co.*, 388 U.S. 286, 291, 70 S.Ct. 115, 94 L.Ed. 93 (1949).[4] As we view Senn's arguments before the Commission, they did raise, albeit in somewhat different form, the issue of whether the operating authority stemming from an "E" notice is identical to the operating authority granted by a "G" certificate. As a consequence, we think that we are not foreclosed by the *Tucker* rule from addressing the issue.

Senn asserts that it would acquire greater rights or rights entitled to greater protection if it were granted a "G" certificate than if it were the possessor of only those rights flowing from an "E" notice. We are not persuaded that this is so. While Senn asserts that "there is a monumental difference between letter-notice authority and a certificate of public convenience and necessity," Senn can cite little to support this statement. It does cite *Artim Transportation System, Inc., Elimination of Gateways* (Unreported, Docket No. MC–41406, Sub. Nos. E–9, E–18, E–19, October 28, 1975), wherein it claims that the Commission indicated that letter-notice authority has no existence apart from its underlying certificated authority. Yet, as the Commission points out, it has held that both "G" certificates and "E" notices are separately transferable under the provisions of §§ 5(2) and 212(b) of the Interstate Commerce Act when after the transfer the transferor will not retain a duplicating operating authority. *Maxwell Co., Petition for Declaratory Order*, 126 M.C.C. 166 (1976).

Senn also calls attention to 49 C.F.R. § 1065.1(d)(1)(ii) which provides that, in granting letter-authority the "Commission reserves the right to require that a carrier terminate these operations if it should later be discovered that the carrier's operations do not qualify for the benefits of this rule." But that provision does not appear to introduce any greater substantial doubt concerning a carrier's rights to operate under an "E" notice than under a "G" certificate, since the Commission always has the right to correct inadvertent errors in certificates of public convenience and necessity. *American Trucking Associations, Inc. v. Frisco Transportation Co.*, 358 U.S. 133, 144–46, 79 S.Ct. 170, 3 L.Ed.2d 172 (1958).

■ In reply to Senn's contentions, the Commission asserts that *Eagle Motor Lines,*

---

**4.** Senn could seek a declaratory judgment with respect to its rights under § 554(e) of the Administrative Procedure Act, 5 U.S.C. § 554(e). That statute authorizes the Commission "in its sound discretion" to issue a "declaratory order to terminate a controversy or remove uncertainty." The Commission exercised this authority in *The Maxwell Co., Petition for Declaratory Order,* 126 M.C.C. 166 (1977).

*Inc. v. ICC,* 545 F.2d 1015 (5 Cir. 1977), and *Maxwell Co., Petition for Declaratory Order, supra,* make it clear that a carrier has no fewer rights or less protection under a letter-notice than under a "G" certificate. *Eagle* held that the holder of operating rights under an "E" notice was entitled to the same notice and hearing before it could be revoked as the holder of a formal certificate of public convenience and necessity. *Maxwell,* as before stated, held that "E" rights were separately transferable from the underlying certificates if the transferor would not retain duplicating rights after the transfer was effected. While we agree that these decisions go far toward supporting the Commission's contention, there may be other differences between the two types of operating rights of which neither we nor Senn are presently aware. We therefore decide the issue by accepting the Commission's assertion that the carrier's rights under an "E" notice and a "G" certificate are identical but without prejudice to Senn's right to reopen the point if in future and in the context of actual facts it appears that there are substantial differences between the authority conferred upon a carrier under an "E" notice as distinguished from a "G" certificate. Unless and until those differences materialize, we agree that the Commission acted properly in denying Senn's "G" application to the extent that it duplicated Senn's "E" notices and that Senn had no right to exchange its "E" notice authorities for a "G" certificate.

### III.

Senn does not challenge the adequacy of the Commission's findings in denying its non-duplicating application under the usual Commission standards, nor does Senn claim that they are unsupported by substantial evidence under the established standards of judicial review. Instead, Senn contends that the Commission incorrectly found that Senn had failed to prove a public need for the authority sought in its "G" application because the Commission, as a matter of course, applies a lesser standard of proof in determining whether to grant unopposed applications and Senn met this lesser standard.

Initially, as we view the record, parts of Senn's non-duplicating application were challenged by other carriers and all were challenged by at least one carrier so that any such lesser standard should not have been applied. In any event, the presence of opposition is not determinative. The regulation governing the granting of "G" applications by a carrier, like Senn, who relies on certificated authorities issued to it after November 23, 1973, as a result of an application pending on that date, spells out that the applicant is required to prove, with shipper support, that a public need exists for the proposed service. 49 C.F.R. § 1065.-1(d)(2)(ii)(B). The Commission has stated that carriers like Senn must prove that "the present or future public convenience and necessity" required the proposed direct operations. *Gateway Elimination,* 119 M.C.C. at 554. That standard, as well as the language of the regulation, embodies the mandate of § 207(a) of the Interstate Commerce Act, 49 U.S.C. § 307(a), that a certificate shall be issued "if it is found . . . that the proposed service . . . is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied . . . ."

The Commission has announced the criteria by which it evaluates public convenience and necessity, *Pan American Bus Lines Operation,* 1 M.C.C. 190, 203 (1936), and it has described the type of evidence that it expects an applicant to produce, *John Novak Contract Carrier Application,* 103 M.C.C. 555, 557 (1967). In both pronouncements, as well as in the statute, there is no suggestion that the statutory standard, the criteria for proof or the type of evidence, is any different to support an unopposed application than to support an opposed application.

■ Nor do we see in any of the cases cited by Senn any clear emergence of a principle that an unopposed application requires a different quantum or quality of proof from one which is opposed. We do not think that legally or factually the proposition is established. It therefore follows

that we reject this attack upon the correctness of the Commission's orders; and since the Commission's orders have substantial evidentiary underpinnings, they are

AFFIRMED.